SLR:LDM:TYH
F.#2012V00949

**12 M 549**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

In re the Seizure of:

A SUM OF FUNDS NOT TO EXCEED
$151,815.00 HELD AT CITIBANK
ACCOUNT NUMBER 9117658382 HELD
IN THE NAME OF TSB PLUS DEAL
D/B/A EYO AMERICA;

------------------------------X

**AFFIDAVIT OF
JAMES H. GRATHWOHL
IN SUPPORT OF AN
APPLICATION FOR
SEIZURE WARRANT**

James H. Grathwohl, being duly sworn, deposes and says:

      1.  I am a Special Agent with the United States
Department of Homeland Security ("DHS"). I have held the position
of Special Agent for approximately nineteen years. In addition, I
was assigned to the Joint Terrorism Task Force for seven years. I
am currently a member of the El Dorado Task Force (the "Task
Force"), which is comprised of federal, state and local law
enforcement officers. The Task Force is organized and led by the
DHS and focuses on money laundering investigations. Through my
work with the Task Force, I have participated in investigations
relating to the laundering of illegal proceeds through the use of
structured cash deposits.[1]

---

[1] Pursuant to Sections 403 and 412 of the Homeland Security
Act of 2002 (Pub. L. 107-296), in conjunction with a Delegation
from the Secretary of Treasury (Treasury Order 100-16), certain
powers previously held by the U.S. Customs Service, including the
power under 18 U.S.C. § 981(b)(1) to seize property subject to
forfeiture, were transferred to DHS.

2.    This affidavit is submitted in support of the United States' request for a seizure warrant, pursuant to 18 U.S.C. §§ 981(b) and 982, 21 U.S.C. §§ 853 and 881(b), and 31 U.S.C. § 5317(c), for an amount of funds not to exceed $151,815.00 held at Citibank account number 9117658382 (the "Target Account") held in the name of TSB Plus Deal d/b/a Eyo America.    Such funds constitute; (a) property involved in violations of 18 U.S.C. §§ 1956 and/or 1957, and are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1)(A); (b) funds traceable to the sale of narcotics and subject to forfeiture pursuant to 21 U.S.C. §§ 853 and 881; and/or (c) property involved in violations of 31 U.S.C. § 5324 and subject to forfeiture pursuant to 31 U.S.C. § 5317(c).

3.    I have not included each and every fact I know about this investigation in this affidavit.    Rather, I am setting forth herein the facts that are required to establish probable cause for the seizure of funds on deposit in the Target Account.

## STATUTORY BACKGROUND

4.    Pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1)(A), any property, real or personal, which is involved in a transaction or attempted transaction in violation of federal money laundering laws, 18 U.S.C. §§ 1956 or 1957, and any property traceable thereto, is subject to forfeiture to the United States.

2

5.     Pursuant to 21 U.S.C. §§ 853 and 881(a)(6), all property, real or personal, which constitutes or is derived from proceeds traceable to the sale of a controlled substance or was used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the sale of a controlled substance, is subject to forfeiture to the United States.

6.     Pursuant to 31 U.S.C. § 5317(c), any property involved in a violation of 31 U.S.C. § 5324, or a conspiracy to commit any such violation, and any property traceable to such property, is subject to forfeiture to the United States.

7.     This Court is empowered to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981 and 21 U.S.C. § 853(f), 31 U.S.C. § 5317 and 21 U.S.C. § 881 by 18 U.S.C. § 981(b), 31 U.S.C. § 5317(c) and 21 U.S.C. § 881(b), respectively.

### MONEY LAUNDERING

8.     Narcotics traffickers amass large cash proceeds from the sale of narcotics in the United States.  The traffickers, or those associated with the traffickers, frequently attempt to give the impression of legitimacy to those proceeds; i.e., to "launder" them by making the proceeds appear to have been generated by a legitimate source.  The traffickers must also devise various methods to remit those narcotics proceeds to suppliers of narcotics located in Colombia and other South American countries, which are

3

known source locations of narcotics, without alerting governmental or law enforcement agencies in either country.

9.   In order to accomplish this goal, narcotics traffickers frequently utilize domestic and foreign banks and/or financial institutions in order both to make their narcotics profits appear to be from legitimate sources and to move those profits through the financial system into the countries where narcotics are produced. .

10.   A popular method to launder narcotics proceeds is for narcotics traffickers, through a third party, to "sell" their narcotics proceeds in the United States for pesos in Colombia. This practice, commonly known as the Black Market Peso Exchange ("BMPE"), is centered on a BMPE broker who can bring the drug dollars and the legitimate pesos together.

11.   In a common BMPE scheme, a BMPE broker will identify a South American businessperson, who imports goods from places such as the United States, China, or Panama.  The BMPE broker will offer the South American businessperson an opportunity to pay the debt owed to the exporter in the foreign country at a significant discount compared to making the payment through a South American bank.  The South American businessperson who agrees to this scheme will then turn over the payment for the imported goods in the form of pesos to the BMPE broker who in turn will contact a Drug Trafficking Organization ("DTO").  When the BMPE broker contacts

4

the DTO, the broker will offer the pesos in South America in exchange for the narcotics proceeds which are located in the United States.

12. The BMPE broker will then arrange to have the narcotics proceeds picked up by a member of the BMPE broker's organization. These money pick-ups will usually occur between two people who have never met before and will most likely never meet again. These pick-ups frequently involve several hundred thousand dollars in narcotics proceeds.

13. Following the money pick-up, the BMPE broker arranges to forward those funds to the exporter in the United States. This is frequently accomplished by remitting those funds directly to the exporter by depositing the narcotics proceeds into accounts held by the exporter. Frequently, these deposits can be made in different geographical locations, where the DTO is located, rather than transporting illicit dollars to the location where the exporter is located.

## BANK SECRECY ACT

14. The Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5313 et. seq., also known as the Bank Secrecy Act (the "BSA"), was designed to combat money laundering and other crimes by imposing reporting requirements on virtually all transactions involving more than $10,000 in United States currency.

15. Specifically, under 31 U.S.C. § 5313(a) and its

5

related regulations, when a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of U.S. coins or currency ("cash") in an amount greater than $10,000, the institution shall file a Currency Transaction Report ("CTR") for each cash transaction, such as, by way of example, a deposit, withdrawal, exchange of currency or other payment or transfer by, through or to a financial institution.  CTR's are filed with the Financial Crimes Enforcement Network ("FinCen") at the Detroit Data Center on forms that require, among other things, the identity of the individual who conducted the transaction and the individual or organization for whom the transaction was completed.

16.   Many individuals involved in illegal activities, such as narcotics trafficking and money laundering, are aware of the reporting requirements and take active steps to cause financial institutions to fail to file CTRs.  These active steps are often referred to as "structuring."  They involve making multiple cash deposits or withdrawals, in amounts less than $10,000, but which in the aggregate exceed $10,000, to multiple banks and/or branches of the same bank on the same day or consecutive days. Structuring is prohibited by 31 U.S.C. § 5324.

17.   Finally, pursuant to 31 U.S.C. § 5331 and related regulations, any trade or business that receives more than $10,000 in one or more related transactions, is required to collect personal identifying information of the customer, and must file

that information on a form filed with the Internal Revenue Service ("IRS"). These forms are commonly referred to as "form 8300." Businesses that structure funds into their bank accounts will frequently fail to file form 8300s in an attempt to further hide their cash activity.

**FACTS**

18. The Target Account is held in the name of TSB Plus Deal d/b/a Eyo America ("Eyo America") which is a business incorporated in the state of Florida. Osni Dos Santos and Cristiane Debarros are the sole signatories to the Target Account.

19. According to documents used to open the Target Account, Eyo America is a cellphone wholesaler based in Miami, Florida. Public records indicate that Eyo America is located at 1315 NW 98th Court, Unit 3, Miami, Florida 33172.

20. From July 26, 2011, to December 19, 2011, there were thirty-eight (38) suspicious cash deposits made into the Target Account that were indicative of structuring. Specifically, there were numerous and regular cash deposits which were made in individual dollar amounts of between $1,400 and $8,278. While there was no one deposit that exceeded $10,000, there were numerous instances where deposits made on the same day, or on consecutive business days, aggregated to amounts in excess of $10,000. The total amount of this structuring was $151,815.00. **Bold** transactions indicate same or consecutive business day transactions:

| Date | Amount | Location |
|------|--------|----------|
| 7/26/11 | $4,400.00 | Houston, TX |
| 7/27/11 | $4,000.00 | San Pedro, CA |
| 7/28/11 | $4,000.00 | Union, NJ |
| 8/10/11 | $5,000.00 | San Jose, CA |
| 8/10/11 | $5,080.00 | New York, NY |
| 8/31/11 | $2,500.00 | Willow Grove, PA |
| 8/31/11 | $2,500.00 | Germantown, MD |
| 8/31/11 | $4,890.00 | Katy, TX |
| 8/31/11 | $4,890.00 | Houston, TX |
| 8/31/11 | $2,960.00 | Torrance, CA |
| 8/31/11 | $2,960.00 | Hauppauge, NY |
| 9/1/11 | $2,860.00 | Germantown, MD |
| 9/1/11 | $2,580.00 | Torrance, CA |
| 9/20/11 | $5,410.00 | Katy, TX |
| 9/20/11 | $4,400.00 | Houston, TX |
| 9/20/11 | $4,000.00 | West Houston, TX |
| 9/23/11 | $2,600.00 | Philadelphia, PA |
| 9/23/11 | $2,400.00 | Philadelphia, PA |
| 9/23/11 | $1,400.00 | Hauppauge, NY |
| 10/14/11 | $2,700.00 | Philadelphia, PA |
| 10/14/11 | $2,300.00 | Philadelphia, PA |
| 10/17/11 | $2,400.00 | Philadelphia, PA |
| 10/17/11 | $2,000.00 | San Jose, CA |
| 10/18/11 | $2,000.00 | Lampasas, TX |
| 10/24/11 | $3,000.00 | Katy, TX |
| 10/24/11 | $4,000.00 | San Pedro, CA |
| 10/25/11 | $6,000.00 | West Houston, TX |
| 10/26/11 | $3,900.00 | Houston, TX |
| 10/26/11 | $4,000.00 | Katy, TX |
| 12/14/11 | $8,850.00 | New York, NY |
| 12/15/11 | $3,860.00 | West Houston, TX |
| 12/15/11 | $4,100.00 | Union, NJ |

| 12/15/11 | $5,941.00 | Springfield, NJ |
|----------|-----------|--------------------|
| 12/15/11 | $6,000.00 | Miami, FL |
| 12/15/11 | $7,000.00 | Miami, FL |
| 12/15/11 | $8,278.00 | Jackson Heights, NY |
| 12/16/11 | $3,740.00 | Miami, FL |
| 12/19/11 | $5,316.00 | Houston, TX |

21.  Many of these deposits were made on the same day or on consecutive business days, and many of the same day deposits were done at different branches in the same geographic area, with total daily deposits exceeding $10,000.  For example, on September 20, 2011, three cash deposits were made at three different Citibank branches.  The first was a $5,410 cash deposit made at a Citibank branch in Katy, Texas.  This was followed by a $4,400 cash deposit at a Citibank branch in Houston, Texas. A third deposit of $4,000 was made at a Citibank branch in West Houston, Texas. The total amount of these four same-day transactions was $13,810.

22.  Additionally, the  structuring activity occurred at Citibank branches located in Florida, New Jersey, Pennsylvania, California, Texas, Maryland, and New York. However, there are no indications of Eyo America maintaining any places of business or agents outside of Florida.

23.  As discussed above, pursuant to 31 U.S.C. § 5331 and related regulations, any trade or business that receives more than $10,000 in one or more related transactions, is required to file a form 8300 with the IRS.  However, despite the extensive

cash deposit activity described above, Eyo America has never filed any form 8300s with the IRS.

24.  As set forth above, there is probable cause to believe that a sum of funds on deposit in the Target Account is subject to seizure and forfeiture as; (a) property involved in violations of 18 U.S.C. §§ 1956 and/or 1957, and therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A); (b) funds traceable to the sale of narcotics and subject to forfeiture pursuant to 21 U.S.C. § 881; and/or (c) property involved in violations of 31 U.S.C. § 5324 and subject to forfeiture pursuant to 31 U.S.C. § 5317(c).

25. Pursuant to 18 U.S.C. § 984, in any forfeiture action in rem in which the subject property is cash or funds deposited in an account in a financial institution, any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture.

I declare under penalty of perjury that the foregoing is true, to the best of my knowledge, information, and belief.

Dated:    Brooklyn, New York
          June 6, 2012

_____
James H. Grathwohl
Special Agent
Department of Homeland Security


Sworn to before me this
___ day of June 2012

_____
HON. JOAN M.        S/ Azrack
UNITED STATES
EASTERN DISTR

11